IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA20-129

Filed: 15 December 2020

Wake County, No. 19 CVS 3859

THE UMSTEAD COALITION, RANDAL L. DUNN, JR., TAMARA GRANT DUNN, WILLIAM DOUCETTE, and TORC (a/k/a TRIANGLE OFF-ROAD CYCLISTS), Plaintiffs

v.

RALEIGH-DURHAM AIRPORT AUTHORITY and WAKE STONE CORPORATION, Defendants

Appeal by Plaintiffs from an Order entered 8 November 2019 by Judge A. Graham Shirley in Wake County Superior Court. Heard in the Court of Appeals 23 September 2020.

*Nigle B. Barrow, Jr. and Mattox Law Firm, by Isabel Worthy Mattox and Matthew J. Carpenter, for plaintiffs-appellants.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by J. Mitchell Armbruster and Steven M. Sartorio, and Hedrick, Gardner, Kincheloe & Garofalo LLP, by Patricia P. Shields, for defendants-appellees.*

*Heidgerd & Edwards, LLP, by Eric D. Edwards and C.D. Heidgerd, and Ron Sutherland, for amicus Wild Earth Society, Inc.*

HAMPSON, Judge.

### Factual and Procedural Background

The Umstead Coalition, Randal L. Dunn, Jr., Tamara Grant Dunn, William Doucette, and TORC (a/k/a Triangle Off-Road Cyclists) (collectively, Plaintiffs) appeal

an Order granting Summary Judgment to Raleigh-Durham Airport Authority (RDUAA) and Wake Stone Corporation (Wake Stone) (collectively, Defendants) and denying Plaintiffs' request for a Preliminary Injunction related to RDUAA's lease of airport real property known as the Odd Fellows Tract to Wake Stone for a gravel mine.  Relevant to this appeal, the Record before us tends to show the following:

The Umstead Coalition is a North Carolina nonprofit corporation dedicated to the appreciation, use, and preservation of the William B. Umstead State Park abutting the Odd Fellows Tract.  Randal and Tamara Dunn (Dunns) are Wake County residents and live on property adjacent to the Odd Fellows Tract.  William Doucette is a Wake County resident and Umstead Coalition member.  TORC is a North Carolina nonprofit corporation seeking to establish and maintain mountain biking trails in the Triangle region to promote responsible mountain biking and ensure its future.

The North Carolina General Assembly chartered RDUAA in 1939 through a public-local law.  An Act Enabling the City of Raleigh, the City of Durham, the County of Durham, and the County of Wake, to Jointly Establish an Airport and Providing for the Maintenance of a Joint Airport by said Cities and Counties, 1939 N.C. Sess. Laws ch. 168 (Charter).  The Charter allows the cities of Raleigh and Durham, and the counties of Wake and Durham (Governing Bodies), to jointly acquire land suitable for "airports or landing fields[.]"  *Id*. §§ 2-5.  The Charter instructs the Governing

Bodies to elect a Board of Directors (the Board) for RDUAA—with each of the Governing Bodies appointing an equal number of directors. *Id.* §§ 5-6. The Charter also required the Board to "act in an administrative capacity" and to have "the authority to control, lease, maintain, improve, operate, and regulate the joint airport or landing field." The Board was vested with "complete authority over any airport or landing field jointly acquired" by the Governing Bodies. *Id.* § 7. As a public-local law, the Charter only applied to the Governing Bodies. *Id.* § 8 ("This Act shall apply only to the City of Raleigh, City of Durham, County of Durham, and the County of Wake.").

During World War II, the federal government took ownership of the airport property administered by RDUAA. In 1946, Congress enacted the Federal Airport Act requiring any airport receiving federal funding to abide by federal aviation laws and regulations. Pub. L. 79-377, 60 Stat. 170 (1946), (later codified at 49 U.S.C. ch. 471). In 1947, the federal government executed a deed granting the airport land back to RDUAA subject to certain conditions subsequent and the right for the federal government to reenter in the event those conditions subsequent occurred.

In the ensuing decades, the General Assembly amended RDUAA's Charter and expanded the Board's authority in each successive iteration. In 1955, the General Assembly specifically added language giving the Board authority:

> To lease (without the joinder in the lease agreements of the [Governing Bodies]) for a term not to exceed 15 years, and for purposes not inconsistent with the grants and agreements under which the said

> airport is held by said owning municipalities, real or personal property under the supervision of or administered by the said Authority.

1955 N.C. Sess. Laws ch. 1096 § 1. This amendment also vested the Board with the authority to "operate, own, control, regulate, lease or grant" the right to operate "restaurants, apartments, hotels, motels, agricultural fairs, tracks, motion picture shows, cafes, soda fountains, or other businesses, amusements or concessions . . . as may appear to said Authority advantageous or conducive to the development of said airport" for a term not to exceed fifteen years. *Id.* The amendment granted RDUAA the authority to erect buildings and facilities, borrow money, enter contracts, and expend funds—received from fees and rents from the operation of the above operations—for airport purposes. *Id.*

In 1957, the General Assembly further expanded RDUAA's authority to include "[i]n addition to all other rights and powers herein conferred" the "powers granted political subdivisions under the Model Airport Zoning Act contained within Article 4," within Chapter 63 of the General Statutes[1], and "by the terms of Article 6, Chapter 63 . . . concerning public airports and related facilities." 1957 N.C. Sess. Laws ch. 455 § 2. Then in 1959, the General Assembly reiterated and expanded RDUAA's authority to lease real or personal property under its administration,

---

[1] Chapter 63 of the North Carolina General Statutes broadly titled as "Aeronautics" codifies a number of different statutes adopted over the years and governs, *inter alia*, regulation of airports including authorizing municipalities and counties to establish, acquire, and operate airports. N.C. Gen. Stat. ch. 63 arts. 4, 6 (2019).

without joining the Governing Bodies, for terms not to exceed forty years. 1959 N.C. Sess. Laws ch. 755 § 1. The 1959 amendment also reaffirmed RDUAA's authority to "own, control, regulate, lease or grant to others the right to operate . . . restaurants, apartments, hotels, motels, agricultural fairs, tracks, motion picture shows, cafes, soda fountains, or other businesses, amusements or concessions" RDUAA deemed advantageous or conducive to airport development for terms not to exceed forty years. *Id.*

Since its creation, RDUAA has acquired land surrounding the airport pursuant to the Charter. Specific to this case, the Governing Bodies and RDUAA acquired real estate known as the Odd Fellows Tract in separate conveyances during the 1970s and 1980s. In 1979, the General Assembly again amended RDUAA's Charter to grant RDUAA the authority to bring condemnation actions under its own name without joining the Governing Bodies. 1979 N.C. Sess. Laws ch. 666 § 2.

In September of 2017, RDUAA issued a request for land lease proposals (RFP) to lease three tracts of land RDUAA controlled, including the Odd Fellows Tract. On 9 October 2017, the Conservation Fund submitted a proposal, including a lease-to-purchase proposal for the Old Fellows Tract—with a term of forty years at $12,000 per year. Wake Stone also submitted a proposal to lease the Odd Fellows Tract. On 19 October 2017, RDUAA voted to reject all proposals to lease the Odd Fellows Tract. On 27 February 2019, approximately fifteen months later, RDUAA sent a Notice of

Special Meeting of the Board, via email, to be held on 1 March 2019. The Special Meeting Notice announced the Board would consider a proposal for a twenty-five-year lease with Wake Stone to operate a gravel mine on the Odd Fellows Tract. *Id.* The Record indicates RDUAA and Wake Stone negotiated this lease agreement in private during the fifteen-month gap between the Board's rejection of the original RFP proposals and the Special Meeting. At the 1 March meeting, the Board announced it would discuss the lease—without public comment as the meeting was not a public hearing—and vote on the lease. The Board, with one abstention, unanimously voted to approve the lease. That same day, consistent with the Board's vote, RDUAA and Wake Stone executed an agreement for a mineral lease on the Odd Fellows Tract for a term of twenty-five years—with RDUAA to receive 5.5% of Wake Stone's annual net sales from the gravel mine.

On 12 March 2019, Plaintiffs filed a Verified Complaint for Declaratory Judgment and Injunctive Relief in Wake County Superior Court alleging: (1) RDUAA exceeded its authority and violated the Open Meetings Law by executing the lease without the Governing Bodies' approval; and (2) RDUAA violated state and federal law by approving the lease without required FAA approvals. Plaintiffs also filed Motions for a Temporary Restraining Order and a Preliminary Injunction. Plaintiffs argued Defendants' lease violated N.C. Gen. Stat. § 63-56(f), which generally applies to regulate the governing boards of airports jointly operated by two or more

municipalities. *See* N.C. Gen. Stat. § 63-56 (2019). Plaintiffs contended this statute requires jointly operated municipal airport boards to obtain approval from the governing bodies prior to leasing land for non-aeronautic uses. Plaintiffs also argued the lease violated N.C. Gen. Stat. § 160A-272 requiring municipalities to follow certain procedures for the extended-term lease of real property. Finally, Plaintiffs argued RDUAA violated North Carolina's Open Meetings Law, N.C. Gen. Stat. § 143-318.9 *et seq.*, governing procedures for conducting public meetings and hearings.

On 17 April 2019, RDUAA filed an Answer and a Counterclaim specifically against TORC alleging TORC, "through its members and agents," was trespassing on RDUAA property. Wake Stone filed its Answer on 20 May 2019. With the trial court's leave, Plaintiffs filed an Amended Verified Complaint for Declaratory Judgment and Injunctive Relief on 24 July 2019. The Amended Complaint added an allegation RDUAA violated state and federal law by approving the lease without FAA approval, and its 2017 RFP by conducting subsequent private negotiations. RDUAA and Wake Stone filed new Motions to Dismiss and for Summary Judgment on 7 August 2019. Plaintiffs filed a new Motion for Partial Summary Judgment that same day. RDUAA filed an Answer to Plaintiffs' Amended Complaint and renewed its counterclaim against TORC on 23 August 2019. Plaintiffs then filed a Motion for Permanent Injunction on 5 September 2019. TORC filed an Answer to RDUAA's Counterclaim on 13 September 2019.

Following a hearing and after considering the parties' briefs, arguments, and supporting materials, the trial court entered a Final Order and Decision (Order) on 8 November 2019. As part of its Order, the trial court included a list of "Undisputed Facts." The trial court concluded there was "no genuine dispute as to the material facts" and RDUAA was entitled to summary judgment as a matter of law because the lease with Wake Stone was within the "expansive powers" the General Assembly vested in RDUAA. The trial court also ruled N.C. Gen. Stat. § 63-56 did not apply to RDUAA because RDUAA was not "a board formed by an agreement between . . . municipalities," but was an "independent creation of the General Assembly[.]" Moreover, the trial court determined N.C. Gen. Stat. § 160A-272 did not apply to RDUAA because RDUAA was not a "city" within the scope of Chapter 160A, but rather a corporation "organized for a special purpose." The trial court also concluded RDUAA satisfied the Open Meetings Law because the Special Meeting was properly noticed and public comments were not required. Accordingly, the trial court granted Summary Judgment in Defendants' favor and denied Plaintiffs' Motion for Partial Summary Judgment and Motion for Preliminary Injunction. The trial court did not rule on RDUAA's Counterclaim for trespass against TORC. On 4 December 2019, Plaintiffs filed written Notice of Appeal from the trial court's Order denying Plaintiffs' Motions for Partial Summary Judgment and for a Preliminary Injunction and granting Defendants' Motions for Summary Judgment.

## **Jurisdiction**

As a threshold matter, when it was entered, the trial court's Order was interlocutory because it left open the Counterclaim against TORC. Plaintiffs have, however, filed both a Petition for Writ of Certiorari and a Motion requesting us to take judicial notice of Wake Stone's subsequent Voluntary Dismissal of its Counterclaim. Additionally, the parties dispute whether Plaintiffs have standing to bring their claims in the first place. We address these jurisdictional issues in turn.

*A. Appealable Judgment*

Initially, the trial court's dismissal of Plaintiffs' claims was interlocutory in nature because RDUAA's Counterclaim was still pending. *Veazey v. City of Durham*, 231 N.C. 357, 361-62, 57 S.E.2d 377, 381 (1950) ("An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court[.]"). Because the trial court's Order was interlocutory, Plaintiffs may not have had a right to immediately appeal the Order. *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 725, 392 S.E.2d 735, 736 (1990) ("Generally, there is no right of immediate appeal from interlocutory orders and judgments."). Plaintiffs have filed a Motion to Take Judicial Notice of Defendants' Voluntary Dismissal of the Counterclaim against TORC. Although the Voluntary Dismissal disposes of the case with the trial court—rendering the Order a final judgment—a motion to take judicial notice is not the proper mechanism to establish this fact on the Record. *Horton v.*

*New South Ins. Co.*, 122 N.C. App. 265, 267-68, 468 S.E.2d 856, 857 (1996) ("[T]he proper method to request amendment of the record, when the inclusion of the document has not been addressed by a trial court order settling the record on appeal, is to make a motion in the appellate court to amend the record under N.C.R. App. P. 9(b)(5)."). Accordingly, we deny Plaintiffs' Motion to Take Judicial Notice.

However, under Rule 9 of our Rules of Appellate Procedure, we may also amend the Record on our own initiative. N.C.R. App. P. 9(b)(5)(b) (2020). In the absence of any objection by any party to our consideration of the Voluntary Dismissal, we amend the Record to include the Voluntary Dismissal. Thus, the Record before us, as amended, demonstrates the trial court's Order is now final and Plaintiffs have an immediate right to appeal under N.C. Gen. Stat. § 7A-27(b)(1). Plaintiffs, recognizing their appeal was initially interlocutory, also filed a Petition for Writ of Certiorari seeking review of this case on appeal. Because we have amended the Record and determined Plaintiffs have the right to appellate review from a final judgment, we dismiss Plaintiffs' Petition for Writ of Certiorari as moot.

*B. Standing*

The parties also dispute whether Plaintiffs have standing to bring their claims. Although the parties argued standing to the trial court, the trial court's Order disposes of the Motions for Summary Judgment without expressly addressing standing. "When the record is silent and the appellate court is unable to determine

whether the court below had jurisdiction, the appeal should be dismissed." *State v. Felmet*, 302 N.C. 173, 176, 273 S.E.2d 708, 711 (1981). The question here is whether the Record before us is adequate to establish that Plaintiffs have standing.

Defendants present no argument against Plaintiffs' standing to challenge an Open Meetings Law violation. Indeed, the Open Meetings Law allows "[a]ny person" to "bring an action in the appropriate division of the General Court of Justice seeking . . . an injunction" based on violations of the Open Meetings Law without a showing of "special damage different from that suffered by the public at large." N.C. Gen. Stat. § 143-318.16(a) (2019). Moreover, "[a]ny person" may "institute a suit in the superior court requesting . . . a judgment declaring that any action of a public body was taken . . . in violation of this Article. Upon such a finding, the court may declare any such action null and void." N.C. Gen. Stat. § 143-318.16A(a) (2019). Because Plaintiffs allege RDUAA voted for the lease in a public meeting that violated the Open Meetings Law, they all have statutory standing to bring those claims.

Defendants instead contend Plaintiffs have no standing to challenge the validity of the lease itself in the absence of any showing the Board's approval of the lease resulted in special damages to any of the Plaintiffs. Plaintiffs, in response, contend at a minimum the Dunns have standing, as adjacent property owners, to challenge the lease agreement. Plaintiffs assert the Dunns have shown standing to challenge the lease because they presented evidence the use of the Odd Fellows Tract

adjacent to their property as a gravel mine—in conjunction with RDUAA's condemnation authority—would diminish their property value resulting in special damages to them. Defendants argue the Dunns have no standing to challenge the lease, even as adjacent property owners, because the lease is a legal use of RDUAA's real property.

> At a minimum, standing contains three elements:
>
> (1) "injury in fact"—an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*McDaniel v. Saintsing*, 260 N.C. App. 229, 232, 817 S.E.2d 912, 914 (2018) (citation and quotation marks omitted).

Here, the Dunns allege Defendants' lease agreement was outside the scope of RDUAA's statutory authority to enter leases—and thus not a lawful land use—and have alleged a reduction in their property value, as well as an increase in noise and vibration as a result of Wake Stone's expansion of its existing mine next to the Dunns' property. In addition, for purpose of summary judgment, the Dunns supported these allegations with an affidavit from Robert Mulder, a licensed real estate broker, opining the presence of the gravel mine on property adjacent to the Dunns' would have a material adverse effect on the Dunns' property value. Defendants have offered no forecast of evidence controverting this opinion. Accordingly, for purposes of our review of the trial court's grant of Summary Judgment, we conclude the Dunns have

forecast sufficient evidence of their standing to challenge Defendants' lease agreement.

## Issues

The dispositive issues on appeal are whether the trial court properly concluded: (I) Defendants' lease agreement was within RDUAA's statutory authority; and (II) RDUAA's Special Public Meeting complied with North Carolina's Open Meetings Law.

## Standard of Review

Plaintiffs contend the trial court erred in denying their Motion for a Preliminary Injunction and in granting Defendants' Motion for Summary Judgment when the trial court concluded N.C. Gen. Stat. § 63-56, governing jointly operated municipal airports, and N.C. Gen. Stat. § 160A-272, governing municipal leasing procedures, did not apply to RDUAA; Defendants' lease agreement was within RDUAA's statutory authority; and RDUAA's Special Meeting where the Board voted in favor of the lease agreement satisfied the Open Meetings Law.

When reviewing a trial court's denial of a preliminary injunction, "an appellate court is not bound by the findings, but may review and weigh the evidence and find facts for itself[;]" however, "a trial court's ruling . . . is presumed to be correct, and the party challenging the ruling bears the burden of showing it was erroneous." *Goad v. Chase Home Finance, LLC*, 208 N.C. App. 259, 261, 704 S.E.2d 1, 3 (2010) (citations

and quotation marks omitted). In order to succeed on a motion for a preliminary injunction, a plaintiff must be able to show—in part—the likelihood of success on the merits of the plaintiff's case. *Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977). Therefore, our review of whether the trial court erred in denying Plaintiffs' Motion for a Preliminary Injunction first turns on whether it erred in granting Defendants' Motion for Summary Judgment.

"Our standard of review of an appeal from summary judgment is de novo[.]" *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008). Summary judgment is only appropriate "when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Id.* (citation and quotation marks omitted).

## **Analysis**

I. <u>RDUAA's Authority to Enter into the Lease with Wake Stone</u>

A. *Applicable law governing RDUAA's authority*

Plaintiffs argue Defendants' lease agreement violates statutory leasing requirements for airports created under N.C. Gen. Stat. § 63-56(f). Plaintiffs also contend Defendants' lease agreement violates leasing procedures for municipalities under N.C. Gen. Stat. § 160A-272. Under Section 63-56(f):

> No real property and no airport, other air navigation facility, or air protection privilege, owned jointly, shall be disposed of by the board, by sale, or otherwise, except by authority of the appointed governing bodies, but the board may lease space, area or improvements and grant

concessions on airports for aeronautical purposes or purposes incidental thereto.

N.C. Gen. Stat. § 63-56(f) (2019). Section 160A-272(a1) states a municipal governing board is only permitted to lease municipal property "pursuant to a resolution of the [board] authorizing the execution of the lease or rental agreement adopted at a regular council meeting upon 30 days public notice." N.C. Gen. Stat. § 160A-272(a1) (2019). Meanwhile, Section 160A-272(b1) states leases of municipal property for more than ten years must be treated as property sales subject to advertisement and bidding requirements. N.C. Gen. Stat. § 160A-272(b1) (2019). Thus, Plaintiffs contend Defendants' twenty-five-year lease of the Odd Fellows Tract for a non-aeronautic purpose, adopted at a special meeting with two-days notice, and not subject to a bidding process—after the original RFP—would violate both of these statutes if these statutes applied to limit RDUAA's authority to enter into the gravel mine lease.

First:

[W]here one statute deals with the subject matter in detail with reference to a particular situation and another statute deals with the same subject matter in general and comprehensive terms, the particular statute will be construed as controlling the particular situation unless it clearly appears that the General Assembly intended to make the general act controlling in regard thereto . . . .

*Nat'l Med. Enters., Inc. v. Sandrock*, 72 N.C. App. 245, 249, 324 S.E.2d 268, 271 (1985) (citation and quotation marks omitted). Moreover, as the trial court noted, "[a] local

statute enacted for a particular municipality is intended to be exceptional, and for the benefit of such municipality, and is not repealed by an enactment of a subsequent general law." *Bland v. City of Wilmington*, 278 N.C. 657, 663, 180 S.E.2d 813, 817 (1971) (quoting *City of Charlotte v. Kavanaugh*, 221 N.C. 259, 263, 20 S.E.2d 97, 99 (1942)). Indeed, "[a] public local law applicable to a particular county or municipality is not repealed by a subsequently enacted public law, statewide in its application, on the same subject matter, unless repeal is expressly provided for or arises by necessary implication." *Fogle v. Gaston Cnty. Bd. of Ed.*, 29 N.C. App. 423, 426, 224 S.E.2d 677, 679 (1976). "The general law will not . . . repeal an existing particular or special law, unless it is plainly manifest from the terms of the general law that such was the intention of the lawmaking body. A general later affirmative law does not abrogate an earlier special one by mere implication." *Id.* (quoting *Kavanaugh*, 221 N.C. 259, 20 S.E.2d 97 (1942)) (quotation marks omitted).

The General Assembly allowed RDUAA's Governing Bodies to establish a jointly owned airport by public-local law in 1939. Nothing in Chapter 63 expressly repeals any prior law relating to RDUAA's Charter. Nor is there any indication the General Assembly subsequently acted to repeal any RDUAA Charter provisions by necessary implication. To the contrary, the General Assembly's subsequent amendments to RDUAA's Charter specifically address the Board's authority to lease property owned by the Governing Bodies and administered by the Board. Thus, the

General Assembly confirmed its intent to remove RDUAA from limitations imposed by N.C. Gen. Stat. § 63-56 on leasing of airport property and expressly granted the Board specific authority to lease land for terms not exceeding forty years. *Nat'l Med. Enters.*, 72 N.C. App. at 249, 324 S.E.2d at 271.

Plaintiffs further argue the 1957 amendment to the Charter authorizing RDUAA to exercise authority granted to municipalities under Article 6 of Chapter 63, which contains Section 63-56, demonstrates the General Assembly intended to incorporate Chapter 63, and specifically Section 63-56, into RDUAA's Charter as a limitation on RDUAA's authority. As the trial court correctly concluded, however, the plain language of the 1957 amendment shows this amendment was a grant of authority "[i]n addition to all other rights and powers herein conferred" and did not serve to limit RDUAA's authority under its Charter.[2]

Similarly, the trial court also properly concluded the provisions of N.C. Gen. Stat. § 160A-272 do not apply to limit RDUAA's authority. Although, Section 160A-272 serves to regulate leasing of property by a "city," N.C. Gen. Stat. § 160A-272,

---

[2] Plaintiffs argue the fact RDUAA previously appeared to rely on authority granted under the Uniform Airport Act, including in a 1977 condemnation action and a 1982 timber deed, is evidence the General Assembly did, in fact, intend to limit RDUAA's authority by enactment of the Uniform Airport Act and that RDUAA relied on the provisions of the Uniform Airport Act to engage in these transactions. However, the timber deed contains no citation to any general statute requiring the Governing Bodies' joinder in the conveyance. Also, it appears RDUAA had to use the authority granted under Chapter 63 in the condemnation action because the General Assembly did not grant RDUAA the independent authority to conduct condemnation proceedings in its own name until 1979. The judgment confirming RDUAA's condemnation action cites Chapter 63 as a source of authority, not a limit on RDUAA's authority.

"city" is a defined term under Chapter 160A and "[t]he term 'city' does not include . . . municipal corporations organized for a special purpose" like RDUAA. N.C. Gen. Stat. § 160A-1(2) (2019). Even if it did, Section 160A-2 provides: "Nothing in this Chapter shall repeal or amend any city charter in effect as of January 1, 1972, . . . unless this Chapter or a subsequent enactment . . . shall clearly show a legislative intent to repeal or supersede all local acts." N.C. Gen. Stat. § 160A-2 (2019); *see also* N.C. Gen. Stat. § 160A-3 (2019) (titled "General laws supplementary to charters"). Again, nothing in the Record before us demonstrates Chapter 160A contains "any clear legislative intent to repeal or supersede" any authority or power granted to RDUAA by its Charter and subsequent amendments. Therefore, the trial court correctly concluded Sections 63-56 and 160A-272 did not apply to limit or regulate RDUAA's authority to enter into the lease with Wake Stone.

B.     *RDUAA's authority to enter the lease under its Charter*

Having concluded RDUAA's Charter is not limited by Sections 63-56 or 160A-272 of our General Statutes, we must determine whether the Board had the authority to execute the lease agreement under the terms of its Charter. Plaintiffs argue RDUAA did not have a broad grant giving it "complete authority" over airport property, and the lease was inconsistent with the grants and agreements under which the airport is held; therefore, RDUAA could not enter into this lease agreement without joining the Governing Bodies. For the following reasons, we disagree.

"The General Assembly delegates express power to municipalities by adopting an enabling statute, which includes implied powers . . . essential to the exercise of those which are expressly conferred." *Quality Built Homes, Inc. v. Town of Carthage*, 369 N.C. 15, 19, 789 S.E.2d 454, 457 (2016) (citation and quotation marks omitted). "When determining the extent of legislative power conferred upon a municipality, the plain language of the enabling statute governs." *Id.* If the enabling statute's language is "clear and unambiguous," courts must give the language its "plain and definite meaning." *Id.* However, if the enabling language is ambiguous, "the legislation 'shall be broadly construed . . . to include any additional and supplementary powers that are reasonably necessary or expedient to carry them into execution and effect." *Id.* (quoting N.C. Gen. Stat. § 160A-4).

In this case, the enabling statute delegating legislative authority to RDUAA is the Charter and its subsequent amendments as enacted through public-local laws. In pertinent part, the Charter—as amended—grants RDUAA the authority to lease, without joining the Governing Bodies and for purposes not inconsistent with the grants and agreements under which the airport is held, real or personal property administered by RDUAA. 1959 N.C. Sess. Laws ch. 755 § 1. This amendment restricted such leases to those consistent with the "grants and agreements" controlling the property and to terms not longer than forty years. The Charter also grants RDUAA the authority to "operate, own, control, regulate, *lease* or grant . . .

- 19 -

any airport premises, restaurants, apartments, hotels, motels, agricultural fairs, tracks . . . *or other businesses, amusements or concessions* for a term not to exceed 40 years, as may appear to [RDUAA] advantageous or conducive to the development of said airport." *Id.* (emphasis added).

First, the Charter is unambiguous in that it grants the Board authority to lease[3] *any* property administered by RDUAA. This unambiguous language, by its plain and definite meaning, grants RDUAA broad authority subject only to the "grants and agreements" under which the property is held and for terms not to exceed forty years. The applicable "grants and agreements" would include any grant or agreement which imposes restrictions on the use of airport property. The only such grants or agreements in the Record are the deed reconveying certain property the federal government controlled during World War II and any grants governed by the FAA.

There is no evidence on this Record the lease agreement violated any FAA grants.[4] Plaintiffs, nevertheless, argue the lease agreement violated the deed

---

[3] Plaintiffs also argue the term "lease" does not include a mineral lease like the one in question. As with the statute's other language, we hold the term "lease" is unambiguous and includes any type of lease. If the term unambiguously prohibited mineral leases, the Charter would have to do so expressly. It does not. Moreover, if we found the term ambiguous, we would have to construe the term broadly to give RDUAA the authority to enter any lease it deemed advantageous to airport development.

[4] Plaintiffs contend there is a genuine dispute as to whether RDUAA complied with Federal Aviation Administration (FAA) requirements regarding its Airport Layout Plan (ALP) approval prior to leasing airport land to third parties. We are not convinced the Record establishes a dispute on this fact as the FAA has conditionally approved RDUAA's ALP, and it does not appear on the Record before

reconveying property after World War II because the deed prohibited use of the property for industrial purposes and reserved a right of reentry if the terms were violated. However, the deed reconveying property commandeered by the federal government only applies to the property in existence at the time of the reconveyance, not to land acquired thereafter such as the Odd Fellows Tract. Even if the deed restrictions applied, there is no evidence any federal agency has determined the lease agreement in this case violates the deed restrictions or that the federal government has attempted to exercise its right of reentry.

Thus, the remaining question is whether the language authorizing RDUAA to operate, own, control, or lease property for the list of express uses or for "other businesses" RDUAA deems advantageous for airport development provides authority for the lease in question. Plaintiffs argue this language is unambiguous and the list of expressly permitted uses governs the types of "other businesses" to which RDUAA may lease property.

The North Carolina Supreme Court's decision in *Quality Built Homes Inc. v. Town of Carthage* is instructive here. 369 N.C. 15, 789 S.E.2d 454. In *Quality Built Homes Inc.*, the Town of Carthage enacted ordinances requiring landowners seeking to subdivide property to pay impact fees for planned water and sewer services. *Id.* at

---

us that there has been any attempt to challenge this conditional approval with the FAA or in federal courts. *See* 49 U.S.C. § 46110(a) ("[A] person" challenging an order "issued by . . . the Administrator of the [FAA] . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia or . . . the circuit in which the person resides . . . .").

16-17, 789 S.E.2d at 456. As a municipality established under Chapter 160A, the Town of Carthage was subject to enabling language stating a "city shall have authority to acquire, construct, establish, enlarge, improve, maintain, own, operate, and contract for the operation of any or all of the public enterprises . . . to furnish services." N.C. Gen. Stat. § 160A-312(a) (2015). Moreover, the statute granted the town "full authority to finance the cost of any public enterprise by levying taxes, borrowing money, and appropriating any other revenues therefor." N.C. Gen. Stat. § 160A-313 (2015). The Court held these statutes unambiguously allowed the town to charge for *contemporaneous* water and sewer usage. *Quality Built Homes Inc.*, 369 N.C. at 20, 789 S.E.2d at 458. However, because the ordinances charged impact fees in contemplation of *future* services, the ordinances fell outside the scope of the town's statutory authority. *Id.* at 21-22. 789 S.E.2d at 458-59.

In this case, the enabling statute—the Charter—is unambiguous with respect to the list of expressly authorized concessions and amusements. However, the General Assembly included "or other businesses, concessions, or amusements"—the list was not exhaustive and was not restrictive. The only restriction added to this sentence requires RDUAA to deem other such businesses advantageous or conducive to airport development. Therefore, RDUAA could enter into a lease with *any* other business, subject only to: (1) the forty-year term limit; (2) any FAA restrictions based

on federal grants; and (3) the requirement RDUAA deem the transaction advantageous to airport development.

Here, unlike in *Quality Built Homes Inc.*, RDUAA's Charter expressly contemplates the Board engaging in transactions *prospectively* to bring financial benefits to the airport. The lease agreement in question would provide 5.5% of net sales from any material sold by Wake Stone. Therefore, the lease satisfies the requirement RDUAA only enter into leases it deems *may* be advantageous to airport development. Accordingly, the trial court properly concluded Defendants' lease agreement was within RDUAA's statutory authority under its Charter. We likewise conclude because RDUAA was not governed by the limitations on jointly operated municipal airports in Section 63-56 and had independent statutory authority to enter into the lease with Wake Stone, the joinder of the Governing Bodies in the lease was not required.

## II.    Open Meetings Law

Plaintiffs also contend RDUAA's months of private negotiations and the email notice two days prior to a special public meeting, where the Board allowed no public comment, violated North Carolina's Open Meetings Law.

N.C. Gen. Stat. § 143-318.9 *et seq.* comprises North Carolina's Open Meetings Law. Section 143-318.9 expresses the General Assembly's intent where:

> the public bodies that administer the legislative, policy-making, quasi-judicial, administrative, and advisory functions of North Carolina and

> its political subdivisions exist solely to conduct the people's business, it
> is the public policy of North Carolina that the hearings, deliberations,
> and actions of these bodies be conducted openly.

N.C. Gen. Stat. § 143-318.9 (2019). The General Assembly applied these laws to all public bodies conducting "the people's business." As an "appointed authority [or] board," RDUAA must comply with the Open Meetings Law. N.C. Gen. Stat. § 143-318.10(b) (2019). "[E]ach official meeting of a public body shall be open to the public, and any person is entitled to attend such a meeting." N.C. Gen. Stat. § 143-318.10(a) (2019). Every public body conducting regularly scheduled meetings must post a schedule as the statute directs. N.C. Gen. Stat. § 143-318.12(a) (2019). If a public body holds a "special meeting" outside of a regularly scheduled meeting, it must provide notice at least forty-eight hours before the meeting. N.C. Gen. Stat. § 143-318.12(b)(2) (2019). "Any person" may bring an action for injunctive relief or declaratory judgment for alleged violations of these laws. N.C. Gen. Stat. §§ 143-318.16, 318.16A (2019).

Here, the meeting to vote on the lease agreement was scheduled as a Special Meeting subject to requirements outlined in Section 143-318.12(b). The Record shows RDUAA emailed notice of the Special Meeting more than 48 hours before the meeting.[5] Plaintiffs contend the 48-hour notice was improper, arguing the Board

---

[5] Plaintiffs argue RDUAA violated statutory provisions requiring municipalities and counties give thirty-days notice for a public meeting regarding municipal land leases. As we conclude above, these general statutes regarding municipal land leases do not apply to RDUAA as an entity created by public-local laws.

could only consider the lease agreement at a regularly scheduled Board meeting with thirty-days notice pursuant to N.C. Gen. Stat. § 160A-272. Plaintiffs concede, however, that if Section 160A-272 does not apply, then the forty-eight-hour notice of the Special Meeting was valid. Thus, we conclude the notice of Special Meeting complied with N.C. Gen. Stat. § 143-318.12(b)(2).

Nevertheless, Plaintiffs argue the Board should have permitted public comment on the lease prior to deliberating and voting to approve the lease at the Special Meeting. We disagree.

This Court has previously recognized:

> There is nothing in section 143-318.9 requiring the solicitation of public comment as a prerequisite to a vote on a pending motion. Furthermore, although section 143-318.9 requires "deliberations" of public bodies "be conducted openly," we do not read this statute to mandate a formal discussion or debate of an issue. Section 143-318.9 simply requires that if there is any discussion or debate of "public business" at an "official meeting," that discussion or debate must occur in a meeting open to the public with "any person . . . entitled to attend." N.C.G.S. § 143-318.10(a), (d) (1999).

*Sigma Constr. Co. v. Guilford Cnty. Bd. of Ed.*, 144 N.C. App. 376, 381, 547 S.E.2d 178, 181 (2001). Moreover, there is no independent statutory provision requiring RDUAA's Board to receive public comments or conduct a public hearing prior to consideration of a lease agreement under the Charter. *See, e.g.,* N.C. Gen. Stat. § 153A-304(c) (2019) (requiring public hearings when counties seek to consolidate districts); N.C. Gen. Stat. § 160A-191 (2019) (requiring public hearings before cities

enact Sunday closing ordinances). Therefore, RDUAA did not violate the Open Meetings Law. *See Sigma Constr. Co., Inc.*, 144 N.C. App. at 381, 547 S.E.2d at 181. Thus, the trial court did not err in concluding RDUAA's Special Meeting did not violate the Open Meetings Law.

## **Conclusion**

Consequently, for the foregoing reasons, we conclude the trial court did not err in granting Summary Judgment in favor of Defendants. Therefore, Plaintiffs could also not demonstrate a likelihood of success on the merits of their claims; thus, the trial court did not err in denying Plaintiffs' Motion for a Preliminary Injunction and Motion for Partial Summary Judgment. Accordingly, we affirm the trial court's Order.

AFFIRMED.

Judges BRYANT and COLLINS concur.